**BARRON et al. v. JAMES.**

No. 4315.

Court of Civil Appeals of Texas. Beaumont.

Feb. 21, 1946.

Rehearing Denied May 2, 1946.

A. D. Dyess, of Houston, for appellants.

Campbell & Foreman, of Livingston, Pitts & Liles, and Effie Harper, all of Conroe, for appellee.

WALKER, Justice.

Pat James brought this action in the District Court of Montgomery county against W. E. Barron and Clifton Upchurch to recover damages for injuries which he sustained in a collision with an automobile bus owned by Defendant Barron and driven by Defendant Upchurch under employment by Defendant Barron. Plaintiff also prayed for recovery of his medical expenses and for the value of a horse owned and ridden by him at the time of the collision and destroyed because of injuries received in the collision. From a judgment in behalf of plaintiff, defendants have appealed.

The incident occurred on September 13, 1944, at about 9:30 o'clock a. m., a mile or so west of Montgomery on State Highway No. 105. Plaintiff was riding along the south side of the road, proceeding in an easterly direction toward Montgomery, and the bus approached him from the rear. The road ran up a long slope and the collision occurred a short distance below the crest of the hill. Plaintiff and his horse were seriously injured. At the time, the horse was rearing and twisting about. Plaintiff alleged that a car, travelling at a high rate of speed came over the hill from Montgomery and frightened the horse; and pleaded negligence by Defendants as the proximate cause of his injuries.

In addition to a general denial Defendants specially alleged contributory negligence, unavoidable accident, and that the collision was unforeseeable by the driver of the bus.

The trial was to a jury. In response to various Special Issues the jury found that Defendant Upchurch: (1) failed to have the bus under proper control immediately before and at the place of the collision; (2) that he failed to keep a proper lookout as he approached and undertook to pass plaintiff; and (3) that he failed to reduce the speed of the bus before undertaking to pass plaintiff. His conduct, in each respect, was found to be negligent and, in each respect, approximate cause of the collision. The evidence established as a matter of law that Defendant Upchurch did not sound his horn and that he did not stop the bus before the collision; and further, that he did not turn to the left a sufficient distance to avoid the collision. The jury found that the failure to sound the horn and to stop the bus were each negligent and a proximate cause of the collision. They also found that after he observed the frightened condition of Plaintiff's horse, Defendant Upchurch could have driven sufficiently far to the left to have avoided coming in contact with plaintiff's horse, and that his failure so to do was negligence and a proximate cause of the collision.

The jury found that the collision was not the result of an unavoidable accident, and that plaintiff did not rein his horse into the path of the approaching bus. Plaintiff's damages were assessed at $3,500.

On these findings, and the stipulation of the parties that the value of the horse was $50, the trial court rendered judgment in behalf of plaintiff against defendants for $3,550

Defendants assign error under Points 1 to 21, inclusive, to the order of the trial court overruling a plea of privilege, but these Points raise matters not before us. Before this appeal was filed defendants attempted to perfect an appeal directly from this order but did not file their record in this court within the time provided by Rule 385. They subsequently filed a transcript and statement of facts on their appeal from the judgment on the merits but these records did not contain the plea of privilege and the proceedings had thereunder; and as a basis for reviewing the order overruling the plea on this appeal from the final judgment they tendered a supplemental transcript and statement of facts covering said

plea and said proceedings. Defendants' motions for leave to file this supplemental transcript and statement of facts were denied, and we adhere to the ruling. It appears from the supplemental records tendered for filing, and from defendants' brief as well, that this plea was controverted by the plaintiff and was heard and overruled by the trial court immediately before the commencement of the trial on the merits, and that the order overruling the plea and the judgment on the merits were rendered at the same term of court. We agree with defendants that under the decision in Smith Bros. Grain Co. v. Windsor & Stanley, Tex.Com.App., 255 S.W. 158, an order overruling a plea of privilege can be reviewed on an appeal from a judgment on the merits, if both the order and the judgment are rendered at the same term of court. However, this right of review is not available to the defendants.

■ Under Points 1 to 21, inclusive, defendants have not brought forward anything showing that the trial court lacked jurisdiction to overrule the plea and try the case on the merits. They may, or may not, have demonstrated that the proceedings under the plea were erroneous; but the matters complained of did not affect the trial court's jurisdiction (in the sense of power, as distinguished from right, to try the merits) and at least in this instance, whether in all others or not, complaint of all these matters in a proper motion for new trial after final judgment was a prerequisite to this appeal under Texas Rules of Civil Procedure, rules 320 and 374, the merits of this cause having been tried to a jury. The only assignment appearing in the motion for a new trial filed by the defendants after judgment on the merits reads as follows: "The Court erred in entering upon the trial of this case upon its merits when the plaintiff had wholly failed to discharge the burden cast upon him by law upon the timely filing by the defendants of a Plea of Privilege herein to be sued in the county of their residence—to-wit, Grimes County, Texas; and every action of this Court, including its act of entering judgment upon the merits of this cause in favor of the plaintiff, is wholly void, the Court having no jurisdiction of this cause or of these defendants

because of improper venue." As stated, defendants have not demonstrated any lack of jurisdiction to try the merits of the cause, and this specification of error is too general to meet the requirements of Rules 321 and 322 and of Rules 320 and 374, at least as regards the matters complained of in Points 1 thru 21. Accordingly, defendants have no basis in the record whereby they may review the order overruling the plea of privilege, and no purpose would be served by filing the supplemental transcript and statement of facts.

The supplemental transcript tendered shows that defendants filed a motion for new trial to the order overruling the plea of privilege, and subsequently amended it; but there is no provision in the Rules for a motion for new trial from such an order. At any rate, this proceeding was not related to the motion for new trial on the merits.

As a matter of fact, it seems to be held in some decisions that if defendants expect to review an order overruling a plea of privilege on an appeal from a final judgment on the merits they must identify the order overruling the plea in the appeal bond. Clark v. Dallas Joint Stock Land Bank, Tex.Civ. App., 153 S.W.2d 668; Zurich General Accident & Liability Ins. Co. v. Dyess, Tex. Civ.App., 167 S.W.2d 294. We note that defendants' appeal bond does not refer to the order overruling the plea of privilege.

Under Points 22 and 23 defendants assign error to the trial court's order overruling certain exceptions to the petition. These Points are overruled. The allegations referred to in Point 22 are not in the petition as copied in the transcript; plaintiff's brief states that these allegations were stricken by the trial court. The omissions complained of in Point 23 were supplied to some extent in paragraph 7 of the petition, and if the trial court erred to any extent in overruling the exception referred to in Point 23, it is not apparent that defendants sustained any harm.

■ Under Points 24 to 36, and 66 to 83, inclusive, defendants assign error on the ground that the findings of negligence and proximate cause are not supported by the evidence. These Points are overruled. The evidence supports the findings.

There is evidence of the following matters: At the place where the accident occurred, the road ran up the slope of a hill in an easterly direction toward Montgomery. Back toward the west it descended the hill some 200 yards to a level space, which is sometimes referred to in the record as "the draw," and ran thence some 300 yards up the face of another hill, past the house of one Kate Lemon, and on to Dobbin. There was apparently a slight curve where the road crossed the draw. The country was open; a person on the road near Kate Lemon's house could observe the course of the road down into the level space and up the opposite hill along which plaintiff was riding when struck. The collision occurred a short distance, perhaps 100 yards, below the crest of this last mentioned hill. At that point, plaintiff could see the road up to the top of the hill but he could not observe the reverse slope; a car approaching him from Montgomery would not be seen by him until it faced him from the top of the hill.

The road was topped with gravel, about 22 or 23 feet wide. Where the collision occurred, the roadbed fell away on either side to a shallow ditch which was covered with grass and was quite dry on September 13, 1944. Fences standing well back from the lines of the ditches ran along each side of the road.

The bus was six feet wide, or wider. It carried seats for 25 passengers, apparently arranged in double rows behind the driver's chair on each side of an aisle leading to a rear seat accommodating 5 passengers. Including the rear seat, there were evidently five rows of seats behind the driver. The bus was pulled by a Ford engine, and had hydraulic brakes in good condition. It had seen much use, but there is nothing in evidence to indicate that operating equipment was defective.

Defendant Upchurch, the driver of the bus, was 38 years old at the time of the collision and had been in Defendant Barron's employment since the preceding June 6, or some time about that date. He had been over the road several times; the jury could infer that he was familiar with the road.

On the morning of September 13, 1944, at about 8:30 o'clock the bus left Navasota bound for Conroe via. Montgomery. It ran in an easterly direction through the village of Dobbin, past Kate Lemon's house, down the hill, across the level space and up the slope along which plaintiff was riding, until it struck the plaintiff's horse. At the time of the collision, the bus carried four passengers.

The collision occurred in broad daylight, about 9:30 o'clock a.m. Plaintiff was riding along the south side of the road, perhaps 18 inches off the gravel, on his way to Montgomery; and the bus approached him from the rear. Plaintiff testified that a car travelling at a high rate of speed came over the hill from Montgomery and frightened the horse, which began to rear and twist about, and before he was able to quiet the horse he was struck by the bus. According to his testimony he did not know the bus was approaching. There is evidence from which the jury could find that the horse did not turn into the gravel until immediately before the collision; indeed, Defendant Upchurch himself testified that this occurred when he was 10 or 15 feet behind the horse. Defendant Upchurch testified that he noticed the horse begin to prance, that is, to spring up and down, when he was 30 or 35 yards behind the horse; but the horse quieted and began to walk along the road; that when he was within 20 or 25 feet, the horse suddenly lunged to the right and then to the left, and ran into the bus. There is evidence that the front right door of the bus was damaged, and that the right front fender was crushed at or behind the hub cap on the right front wheel. We think it of no special significance that the bus was damaged at this place, but do attach some significance to the evidence showing that glass panels in this door were fractured.

It thus appears from Defendant Upchurch's testimony that when a considerable distance behind the horse he observed the nervous action of the horse and was put on notice that the animal might act precisely as it did. Nevertheless, he proceeded; and it is our conclusion from the record as a whole that probably the fundamental questions of fact before the court were, whether he had the bus under proper control immediately before and at the time of the collision, and if not, whether this consti-

tuted negligence. These questions, and the incidental matter of proximate cause, were submitted to the jury in Issues 1, 2 and 3; and the evidence supports the findings made in response, namely that Defendant Upchurch did not have the bus under proper control, that he was accordingly negligent, and that this negligence was a proximate cause of the collision. However, the question, whether Defendant Upchurch had the bus under proper control is related to matters submitted in other issues, namely, whether he could have avoided the collision by turning to the left, whether he failed to reduce speed or keep a proper lookout, and whether he should have stopped the bus or blown the horn; and a detailed consideration of the evidence relevant to Issues 1, 2 and 3 will also show that the other findings of negligence and proximate cause were supported by the evidence. We make the following statement from the record in support of our conclusions.

(1) The jury was authorized to find that Defendant Upchurch, after he saw the frightened condition of plaintiff's horse, could have driven the bus sufficiently far to the left to avoid the collision.

We have referred to Defendant Upchurch's testimony that he saw the horse begin to prance when he was 30 or 35 yards behind the horse. There was evidence that plaintiff could have quickly brought his horse under control. He testified that he had raised the horse; that the animal was 8 years old and had been broken at the age of three years; that the horse weighed about 800 pounds; that it was his main riding horse; that it was accustomed to automobiles and was not of a wild or fractious disposition and that the conduct of the horse on this occasion was unusual. Plaintiff was corroborated by his daughter. Plaintiff was a man between 60 or 70 years of age, or was perhaps 70 years old; but his activities before the collision indicate that he was strong and active; and he was evidently an experienced horseman. The horse was saddled and bridled.

The jury could infer that the horse had not turned very far into the gravel topping and that the collision occurred near the south line of the gravel. Plaintiff was thrown from his horse and lost consciousness as a result of the collision. He said that when he revived, he found himself lying on the shoulder of the road off the gravel. The witness Madely placed him across the edge of the gravel, perhaps half of his body being on the gravel and the other half being on the adjoining shoulder. Glass and blood were found on and near the shoulder, and the jury could infer that this lay where plaintiff fell; and could also infer that this glass came from the fractured panels in the bus door. Horse tracks were found along the side of the road up to or near this point; the jury could infer that these were the tracks of plaintiff's horse. Madely's testimony shows that he found the bus tracks running along the right-hand edge of the road up to or near the place where plaintiff lay, and that here these tracks turned sharply to the left, with deep indentations in the gravel topping. Palmer, a highway patrolman, gave evidence more favorable to defendants but he said that the gravel was about 23 feet wide, and placed the track of the right rear wheel of the bus about 12 or 13 feet from the left, that is, the northern line of the gravel. As previously noted, Defendant Barron testified that the bus was 6 feet wide "or wider."

There was abundant evidence that the shoulders of the road were broad and sloping, that the ditch along the north side of the road was shallow, dry and carpeted with grass, and that an automobile could have been safely driven along this shoulder, completely off the gravel. Palmer drove the patrol car, a Ford, along this shoulder. He testified:

"Q. What side of the road was the horse on? A. The horse was on the north side.

"Q. Was he between the graveled, the main traveled portion of the highway and the ditch on the north side, or between the ditch and the fence? A. I just don't know if I could get that close to it or not; I don't remember exactly. He was right there, though, on the grass portion.

"Q. On the north side? A. I could have been—the ditch is very shallow there —and it could have been on one side or the other; and it is possible he might have

been in the middle of it, because it is all grass and very shallow. I didn't pay any attention where he was standing."

The horse was shown to be about opposite where plaintiff lay. Since the right front leg of the horse was broken and bleeding, the ditch must have been shallow and evidently did not have steep sides. This witness testified further:

"Q. Who went with you out there? A. I was in the Patrol car.

"Q. You were in a Ford car? A. Yes, sir. * * *

"Q. When you drove there, that was one over the tracks? A. No sir, I didn't drive over the tracks.

"Q. You drove up to it? A. Not to where it happened. I drove up to it on the grass.

"Q. Is there grass there? A. Yes, sir, there was then.

"Q. Grass or black land? A. There was grass then.

"Q. What kind of grass was it? A. I couldn't answer that. It was green grass.

"Q. As a matter of fact, isn't it black land? A. No, it was grass. * * *

"Q. This green grass over to the ditch line, the shoulders are wide sloping shoulders? A. Yes, sir. It gradually slopes off.

"Q. Wide sloping— A. Wide shoulders.

"Q. Plenty of room for a man to drive a car off if he want to? A. Yes, sir.

"Q. You drove your car off there? A. Yes, sir, I drove my car off there.

"Q. It was dry and no mud? A. Yes, sir. * * *

"Q. If you got there within a hour or two hours after the wreck, you don't know how many vehicles went over the road? A. No, sir, but I do know there was one set of duals there; and they directed me off the road when I got there, and every car that came by there was directed off."

Nevertheless, the bus stopped wholly on the gravel. It stood on the left side of the road, at an angle to the line of the gravel topping. Madely testified:

"Q. When you saw the bus it was headed in an easterly, but to the north, direction—northeasterly direction? A. No, it was on the north side of the road headed east.

"Q. Was it square with the road? A. Yes, sir.

"Q. Mr. Madely, had it been pulled up and moved and straightened out? A. Pulled up and stopped.

"Q. But parallel with the road? A. Just cut across the road."

The foregoing matters may indicate to some extent that Defendant Upchurch failed to keep a proper lookout; but it is also suggested that the plaintiff could have gotten his horse under control very quickly and that if Defendant Upchurch had turned the bus to the left at a proper time as he could have safely done, he could have avoided the plaintiff.

(2) There is evidence that Defendant Upchurch did not keep a proper lookout.

There was never anything to obstruct Defendant Upchurch's view of the plaintiff. His testimony shows however that he first observed plaintiff as the bus came down into the level space; plaintiff was then ascending the hill on the opposite side. The bus was then at a considerable distance to the rear, yet it is apparent that Defendant Upchurch did not observe Plaintiff closely. He did not notice whether Plaintiff was running or walking the horse. "I just noticed a person riding down the road on a horse."

The jury could infer that he did not keep plaintiff in sight continuously thereafter, although the comparatively narrow width of the road and the plaintiff's nearness to the gravel topping suggest that if Defendant Upchurch had looked down the road he must necessarily have seen plaintiff. This defendant testified:

"Q. Now, when you started up this draw, out of the draw, and up this slope, did you keep your eye on the negro? A. Not all the time, I didn't. I was looking down the road however.

"Q. That road, the gravel portion, is twenty or twenty five feet wide, isn't it? A. Yes, sir.

"Q. It isn't as wide as from me to that wall over there, is it—the gravel portion? A. No, sir.

"Q. Now, where you are sitting there looking at me, you can see Mr. Dyess and Judge Browder. over there by the rail, and still look at me, and see us all together? A. Yes, sir.

"Q. And you were looking down the road and you didn't see the negro all the time? A. I· didn't keep my eye right on him."

We have referred to Plaintiff's testimony respecting an automobile coming over the hill from Montgomery. Defendant Upchurch said he saw no such car. He testified:

"Q. Did you see another car that come up over the hill and met the negro's horse? A. No, sir.

"Q. Were you looking at it? A. I wasn't looking for one, but I would have seen it, sure." If the jury believed the plaintiff they could have found that Defendant Upchurch was not watching the road.

Reference has been made to testimony by Defendant Upchurch that he saw the horse begin to prance some 30 or 35 yards in advance of the bus, and that he performed certain acts thereafter. Yet he also said: "You say you didn't notice the negro all the time from the draw up to where you come together? Didn't have your eye on him all the time? A. No, sir, I didn't have my eye on him all the time."

From Madely's testimony respecting the car tracks running along the side of the road up to or near the place where plaintiff lay on the road, and then turning sharply to the left, with deep indentations in the gravel, and from the foregoing, the jury may have inferred that even if Defendant Upchurch did see the horse begin to prance at the distance of 30 or 35 yards ahead, he did not keep the horse continuously in view thereafter, and perhaps took his eye off the horse when the animal quieted and began to walk. The testimony of Defendant Upchurch is confusing and contradictory in detail; the jury was authorized to reject any portion of it.

(3) There is evidence that Defendant Upchurch, after he observed the action of Plaintiff's horse, did not slacken speed before attempting to pass Plaintiff, or at least that he did not reduce speed appreciably.

He gave evidence that when he observed plaintiff's horse begin to prance, some 30 or 35 yards behind the horse, he was then going about 30 miles per hour. He did not, at that moment reduce the speed of the bus but proceeded and said that at a later moment, apparently at or about the moment when the horse quieted, he took his foot off the accelerator and placed it on the brake pedal and turned away toward the center of the road. The speed of the bus fell off; he said, "My bus was idling down"; that when 20 or 25 feet from the horse, the animal lunged to the right and he put on his brakes.

This testimony raises an inference that the speed of the bus was slightly, not appreciably reduced when Defendant Upchurch was on the point of passing the plaintiff. However, this defendant also gave testimony raising the inference that he did not reduce speed at all. He testified:

"Q. You all were moving at the time the bus and horse come together; you all were moving, weren't you? A. Yes, sir.

"Q. Going 25 or 30 miles an hour, weren't you? A. Yes, sir.

"Q. You testified when you come round the curve you were going 25 or 30 miles per hour? A. Yes, sir.

"Q. And you were asked if you picked it up some, and your answer was: 'very little, if any'? A. Yes, sir."

In connection with the foregoing matters, it is to be borne in mind that he also testified he was making about 25 miles per hour when he struck the plaintiff; and that going up the hill (as he was) he could stop the bus in 25 feet, although he did not succeed in doing this since he also said the horse lunged to the right when he was about 20 or 25 feet away. He also testified that the bus ran on about 20 feet beyond the plaintiff before it stopped; on a former hearing he said the bus ran on after the collision for a distance of 35 or 40 feet (instead

of 20 feet), and on this trial the witness Madely placed the rear end of the bus 40 or 50 feet away from where plaintiff lay on the road. The record indicates that on the former hearing this defendant said the horse turned to the left several yards in advance of the bus; on this trial he put this distance at 10 or 15 feet.

From this confusion the jury had the right to select what they considered most credible, and could believe that the bus was going about as fast when it struck plaintiff as it was when Defendant Upchurch first observed plaintiff.

(4) There is actually some evidence from which the jury could infer that Defendant Upchurch was negligent in failing to stop; the bus was proceeding up a hill, and this defendant testified that the bus could have been stopped in 25 feet. He said:

"Q. All right. At the speed you were going, how quick could you have stopped the bus if you wanted to stop it and not hurt anybody on your bus up that hill, if you knew you had to stop it? A. Coming up the hill I could have stopped it in 25 feet.

"Q. At the speed you were going and with your brakes and equipment, you could have stopped it in 25 feet? A. Yes, sir."

He also said he had his foot on the brake pedal (he had taken it off the accelerator and his bus was "idling down") before the horse lunged to the right; and that this occurred when he was about 20 or 25 feet behind. He said:

"Q. What else did the horse do after he began to prance? A. He calmed down.

"Q. In other words, did he go to walking along? A. Yes, sir.

"Q. Did you keep your same speed? A. No, sir.

"Q. What did you do? A. I taken my foot off the accelerator and put my foot against my brake.

"Q. What did you do then? A. Pulled over in the center of the road.

"Q. What did you do then? A. My bus was idling down.

"Q. And * * * A. And I got up about 20 or 25 feet.

"Q. 25 or 30 feet? A. 20 or 25 feet.

"Q. Or yards? A. Feet.

"Q. All right. A. And the negro was right along here on my right, and I pulled on over in the center of the road, on the left hand side, and suddenly this horse just made a lunge to the right and then turned to the left and lunged into the side of the * * *

"Q. Suddenly the horse made a lunge to the right?—That would be off the pavement? A. Yes, sir.

"Q. What did you do then? A. Put my brakes on.

"Q. Then the horse turned around and come back to the left? A. Yes, sir."

This testimony shows that the plaintiff's horse remained strictly on its own side of the road until this turn to the left into the gravel. The following testimony is relevant here:

"Q. Now, when you got up close to the negro, the last time you saw him, when the horse was on his side of the road, the last time you saw him in that position, how far were you from him? A. In what position?

"Q. Just what I asked you. When you got up close to the negro, the last time you saw the horse on his side of the road, how far were you from him? A. The last time I saw the horse?

"Q. On his side of the road. I asked you how far were you from him the last time you saw the horse on his correct side of the road? A. I would say ten or fifteen feet.

"Q. I will ask you if you said before 30 or 35 yards. A. May I explain one thing?

"Mr. Foreman: Judge, I am trying to have my question answered and then he can explain.

"Q. (continuing) I have asked you if you said before 30 or 35 yards? A. Yes, sir."

There was also evidence that the brakes on the bus were in good condition, that they were hydraulic brakes, and that the bus had dual rear wheels, from which we infer that there were four rear wheels on the bus. There were brakes on the front wheels as well.

(5) The most striking feature of the case is the utter failure of Defendant Upchurch, after observing the action of plaintiff's horse some 30 or 35 yards away, to give any kind of a warning. There was a horn on the bus but it was not sounded. If plaintiff's testimony is believed, he did not know the bus was behind him until he revived as he lay on the road.

■ It is a positive requirement of the Penal Code, Article 801, subd. F, that one approaching a vehicle from the rear signal his intention to pass. If this statute does not apply to a man on horseback, the jury was authorized to infer that this failure to warn plaintiff of the bus was negligence and a proximate cause of the collision.

From all these matters the jury could conclude that Defendant Upchurch was put on notice, in time to take adequate precautions, that the horse might act as he did; but that nevertheless he failed to warn plaintiff of his approach, to keep the horse under observation, to reduce speed, to take advantage of space on the left-hand side of the road into which he could have driven the bus, and that on this witness' own testimony there was, at the very last moment, an opportunity to stop the bus before the collision. The verdict has adequate support in the testimony.

■ Under Point 38 defendants assign error to the action of the trial court in overruling the following objection to issue 6: "These defendants further specially except to Special Issue No. 6 because such issue is upon the weight of the evidence and assumes that the bus came in contact with the horse ridden by the plaintiff, and that the bus ran into the plaintiff and his horse rather than, as is shown by the facts in this case, that plaintiff's horse ran into the defendants' bus." They made substantially the same objection to Issues 7, 9, 11, 12 and 16. The trial court correctly overruled these objections. The fact of a collision was proven as a matter of law, and it is not assumed in these various Issues that either party caused the collision. The Special Issues referred to were not upon the weight of the evidence in the respect contended for by defendants. We

accordingly overrule Points 38 to 42, inclusive.

■■ Under Point 43 defendants assign error to the action of the trial court in overruling four objections to Issue 17, submitting the matter of damages. Objections (a) and (b) refer to the insufficiency of the evidence to support a finding of past or future pecuniary loss. In objection (c) defendants say that the elements of physical and mental pain and suffering should be submitted separately from the element of pecuniary loss. In objection (d) defendants say that Issue 17 permits an award of double damages. Point 43 is overruled. The evidence raises the issues of past and future pecuniary loss. The extent of this loss is to some extent uncertain, but has probably been shown with that degree of precision which the circumstances allow. The trial court properly declined to split up the issues of damages and submit it in two separate Issues. The objection that the Issue permitted an award of double damages does not show what it is in this charge that makes a double award possible. Issue 17 is in the customary form and as plaintiff says is substantially like that before this court in Airline Motor Coaches, Inc. v. Bennett, Tex.Civ.App., 184 S.W.2d 524, 528.

■ Under Points 44 to 65, inclusive, defendants assign error to the action of the trial court in refusing a number of special issues tendered by defendants. These Points are overruled. Defendants' requested issues 20 and 22 submitted evidentiary matters, and are also deemed immaterial. Issues 20A and 23 were adequately covered by the court's definitions of negligence and proximate cause and by the various Special Issues submitted. Since the defendant Upchurch testified that he saw the plaintiff's horse begin to prance when he was about 30 or 35 yards behind the horse, it was unnecessary to submit the question of foreseeability more specifically than it was submitted by the trial court. Issues 21 and 21A were adequately covered by Issues 11, 12 and 13 of the court's charge. Issue 24 was evidentiary in form, and so far as it submitted for decision the

254

question of exactly what part of the bus came in contact with plaintiff's horse, was immaterial to a judgment on the merits. The evidence establishes as a matter of law that the horse and the bus collided. Issue 25 apparently covers the entire case. Whether the collision was unavoidable was submitted to the jury in Issue 19 of the trial court's charge. Issues 26 to 28, inclusive, were adequately covered by Issues 20 to 22, inclusive, of the trial court's charge. Issues 29 to 41 were not raised by the evidence. We note that the basic Issue in the group, Nos. 29 to 31, inclusive, was not in proper form; it submits plaintiff's failure to keep a proper lookout not only for defendant's bus but also for other motor vehicles and the evidence raised no issue regarding plaintiff's failure to keep a proper lookout for any other motor vehicle, even if plaintiff did fail to keep a proper lookout for the defendants' bus. We accordingly overrule Points 44 to 65, inclusive.

Under Point 84 Defendants assign error to the trial court's action in denying the following requested charge: "You are hereby requested to instruct the jury that the plaintiff, by his trial pleadings herein, having alleged that as he was riding along said highway, up a slight hill slope, his horse became frightened, causing it to rear and turn into the highway, he is bound by such pleadings and you must assume these facts as established in answering all issues submitted to you." This point is overruled. Defendants' requested instruction was properly denied for at least the reason that on the whole, plaintiff testified substantially in accordance with the pleadings. The road was not paved; the shoulder where plaintiff was riding was a part of the "highway" and "road," referred to in paragraphs 2 and 4 of the petition and the plaintiff's horse could not very well twist or turn to the left without turning "into" the "highway" or "road."

Under Point 85, Defendants assign error to the trial court's refusal to give the following charge: "You are hereby requested to instruct the jury that in order for an act of omission or commission to constitute negligence it must have been reasonably forseeable to a person of ordinary intelligence and foresight that the accident in question, or some similar accident, might occur as a result of such act of omission or commission." We overrule this Point. We agree with the defendants that foreseeability is an element of negligence as it is an element of proximate cause, but on the facts of this record the standard definitions, given by the trial court, were adequate. The trial court defined negligence as follows: "By the term 'Negligence,' as used in this charge, is meant a failure to do that which a person of ordinary prudence would do under the same or similar circumstances, or the doing of that which a person of ordinary prudence would not do under the same or similar circumstances."

As we have pointed out in some detail, defendant Upchurch testified that he was driving the bus at the time of the collision, and that he saw the horse begin to prance when he was about 30 or 35 yards behind the horse. On these facts the definition of negligence adequately covered the element of forseeability, if there was any issue on the point. If defendants needed further protection, they got it in the court's definition of proximate cause which required a finding that the collision, or some similar event "ought reasonably to have been foreseen by a person of ordinary care, in the light of the attending circumstances, as a natural and probable consequence of" defendants' act or omission.

Under Point 86 Defendants assign error to the trial court's judgment on the ground that plaintiff brought matters before the jury indicating that defendants were insured and would not be required to pay any judgment awarded against them. This, they say, was accomplished by asking Dr. Corrigan, who treated plaintiff, whether he had testified for Defendants' counsel in numerous lawsuits, and by eliciting testimony from defendant Barron that he was not acquainted with defendants' attorney until this case arose. Point 86 is overruled. The following quotation from Dr. Corrigan's testimony shows the transaction first referred to:

"Q. I will ask you, Doctor, if you use the hospital here in Conroe—By the way, you know Mr. A. D. Dyess over there? A. Very well.

"Q. When did you first meet him? A. I don't know if I remember.

"Q. Did you ever testify for him? A. I don't remember that.

"Q. Are you any kin to him? A. No kin."

Defendants did not except to these questions or answers nor did they move for a mistrial on the basis of this transaction. The quotation made does not suggest that defendants were insured. If acquaintances between the witness and defendants' counsel was enough to suggest the existence of liability insurance in force, there were other matters occurring during the examination of this witness, in which defendants' counsel participated, suggesting much more strongly than did the quoted testimony that witness and counsel were well acquainted. We make the following quotation from the examination of Dr. Corrigan:

"Q. Doctor, the condition that Pat was in, and is in now, is that such a condition as to cause a person who has worked all his life to worry?

"Mr. Dyess: Your Honor, I don't think the Doctor would qualify as a psychologist on that. If he feels he is competent to tell whether or not that causes him to worry, I don't have any objection.

"Mr. Foreman: If he objects, we withdraw it.

"Mr. Dyess: I want him to first state he is qualified or feels he is qualified to answer that. * * *

"Q. (By Defendants' counsel) Doctor, we have known one another for a number of years. I believe you may answer this question; I will put it to you this way: You would not want any one of the defendants in this case to have to pay this bill of yours unless the plaintiff was injured through some fault of the defendant?

"Mr. Campbell: We object to that. That has nothing to do with it.

"Mr. Foreman: He knows better than that. That is as unfair as any man could get before a Jury. If he won't object to us doing that, we'll leave him * * *

"Mr. Dyess: I except to that statement. This is the plaintiff's witness, and I wanted to bring out his absolute impartiality;

and, I believe if the Doctor answered, that would be his answer. But I have a right to have him answer that question.

"Mr. Foreman: We object to the Jury speech too, Your Honor.

"The Court: I sustain the objection.

"Mr. Dyess: I except to that remark, and to the ruling of the Court."

The transaction involving the defendant Barron was limited to the following question and answer:

"Q. Did you ever know Mr. Dyess until this case arose? A. No, sir, I didn't." Defendants made no objection at this time. A good deal later, they moved for a mistrial.

The question may have been improper, but the transaction was insignificant, and it was not a necessary conclusion therefrom that defendants were insured and would not be required to pay a judgment against them. Parties to litigation often employ counsel unknown to them before the litigation arose and this is true of parties often in court as it is of people involved in only one suit.

This disposes of all Points of Error before us except Point 37. Under Point 37, defendants assign error to the trial court's action in overruling five objections to Issue 9. In objection (e) defendants say that the form of this Issue involves an assumption that the bus ran into the plaintiff "rather than, as is shown by the facts in this case, that plaintiff's horse ran into the defendants' bus." This objection can be determined by inspecting the Issue. We have done so and hold that this objection was properly overruled, for the reasons heretofore given in overruling Points 38 to 42, inclusive. We find no discussion in defendants' brief of the other four objections and we think we are not required to consider them. However, the Point has become immaterial and need not be considered further.

This disposes of all points of error made by defendants. No error appearing, the judgment is affirmed.

### Motion for Rehearing.

Defendants' motion for rehearing is now before us:

(1) Under grounds 4 and 5 of said motion defendants assign error to the following statement on page 5 of our opinion: "As a matter of fact, it seems to be held in some decisions that if defendants expect to review an order overruling a plea of privilege on an appeal from a final judgment on the merits they must identify the order overruling the plea in the appeal bond. Clark v. Dallas Joint Stock Land Bank, Tex.Civ.App., 153 S.W.2d 668; Zurich General Accident & Liability Ins. Co. v. Dyess, Tex.Civ.App., 167 S.W.2d 294."

The language quoted is withdrawn. On the record before us we are not required to determine whether it was necessary for defendants to refer, in their appeal bond, to the order overruling their plea of privilege, and this court will not determine the question.

(2) We are satisfied with the disposition heretofore made of other matters discussed in defendants' motion for rehearing; and said motion for rehearing is accordingly overruled.